1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

8
9

10
11
12
13
14

| | |
|---|---|
| JASON A. REDON, | CASE NO. 13cv1765-WQH-KSC |
| Plaintiff, | ORDER |
| vs. | |
| BRANDON JORDAN, and ANDRES RUIZ, | |
| Defendants. | |

15  HAYES, Judge:

16      The matters before the Court are the Motion for Summary Judgment (ECF No.

17  83) filed by Defendants, and the Motion to Withdraw Admissions (ECF No. 97) filed

18  by Plaintiff.

19                            **BACKGROUND**

20      On December 23, 2013, Plaintiff filed the amended complaint, which is the

21  operative pleading.  (ECF No. 8).  On January 13, 2014, Defendants filed a motion to

22  dismiss for failure to state a claim.  (ECF No. 11).  On July 28, 2014, the Court granted

23  in part and denied in part the motion to dismiss.  (ECF No. 23).  The Court dismissed

24  all of Plaintiff's state law claims, the 42 U.S.C. § 1983 *Monell* claim, and all of the

25  claims against Defendants City of San Diego, City Attorney Jan Goldsmith, and Miriam

26  Milstein.

27      On August 11, 2014, the three remaining Defendants Ruiz, Jordan, and Miller

28  filed an answer to the amended complaint.  (ECF No. 24).

On July 24, 2015, Defendants Ruiz, Jordan, and Miller filed a motion for judgment on the pleadings.  (ECF No. 41).

On December 17, 2015, the Court granted in part and denied in part the motion for judgment on the pleadings.  (ECF No. 53).  The Court granted the motion as to Counts 1, 4, 5, 6,and 7 as well as all claims against Defendant Miller.  The order concluded that the remaining claim is Count 3 – "use of excessive force as to Defendants Brandon Jordan and Andres Ruiz." *Id.* at 17.

On June 20, 2016, Defendants Ruiz and Jordan filed the Motion for Summary Judgment or, Partial Summary Judgment on the grounds that the use of force was reasonable and/or did not violate a clearly established Constitutional Right.  (ECF No. 83).

On July 25, 2016, Defendants Jordan and Ruiz filed a motion for terminating sanctions.  (ECF No. 95).[1]

On July 26, 2016, Plaintiff filed the Motion to Withdraw Admissions and Strike portions of Defendants' Motion for Summary Judgment.  (ECF No. 97).

On July 28, 2016, the Magistrate Judge ordered a response to the Motion for Terminating Sanctions and ordered that the Motion for Summary Judgment and Motion to Withdraw Admissions "shall remain pending until the resolution of the motion for terminating sanctions."  (ECF No. 98).

On January 13, 2017, this Court vacated the order staying briefing on the Motion for Summary Judgment and Motion to Withdraw Admissions.  (ECF No. 101).  The Court ordered that "[a]ny responses to the Motion for Summary Judgment (ECF No. 83) and the Motion to Withdraw Admissions and Strike (ECF No. 97) shall be filed by 2/13/2017.  Any replies shall be filed by 2/27/2017." *Id.*

On February 13, 2017, Plaintiff filed a response to the Defendants' Motion for Summary Judgment asserting that the force used by the Defendant police officers on

---

[1] On February 14, 2017, the Magistrate Judge entered an order deferring the report and recommendation on the motion for terminating sanctions and allowing supplemental briefing. (ECF No. 103).

- 2 -

May 3, 2011 and August 19, 2011 was not reasonable and constitutionally excessive. (ECF No. 102).

On February 27, 2017, Defendants filed a reply to the Plaintiff's opposition to the Motion for Summary Judgment and a Declaration in support of the opposition to Plaintiff's Motion to Withdraw Admissions. (ECF Nos. 104, 105).

On March 8, 2017, Plaintiff filed a reply to Defendants' response to Plaintiff's Motion to Withdraw Admissions (ECF No. 108).

**FACTS**

May 3, 2011

On May 3, 2011, at approximately 6:12 p.m., San Diego Police Officers responded to a welfare check at the residence of the Plaintiff Jason Redon. The police department had received a call regarding a suicide report from a therapist about the Plaintiff. The officers arrived at Plaintiff's residence. Plaintiff answered the door. Plaintiff states in his declaration,

> I opened the door to find SDPD Officers standing there and realized they must have been dispatched because of my Facebook posting. I invited them in to conduct their investigation, and apologized for the confusion and wasting their time. The officers talked with me and I openly shared what I had posted on Facebook,[2] why I had done it, and explained I wanted to get back to working on my music. I was not a threat to myself or anyone else, and can easily care for myself. I explained it was the best way for me to deal with what I was experiencing.

(ECF No. 102-11 at 3).

Officer Jordan performed a security check of the residence. Officer Jordan states in his declaration,

> I noticed that there were kitchen knives strategically placed near the front entrance and a large screwdriver located on a bookcase near the front door. I also noticed there was broken glass, marijuana, and a bottle of pills lying on the table and countertop . . . During the 10 minute interview, Mr. Redon was visibly emotionally distraught . . . Mr. Redon admitted he posted some disconcerting statements on his Facebook account. Mr. Redon became visibly upset while informing us that he and his wife, Lauren Redon, had an earlier argument. She left him taking their small child and dog with her. His emotional state was rapidly deteriorating as be began crying uncontrollably and had difficulty expressing himself.

---

[2] Plaintiff had posted "No more apologies Lauren, good-bye cruel world, </poof>." (ECF No. 102-11 at 3).

At approximately 6:26 p.m., and due to the nature of the call, Mr. Redon's deteriorating emotional state, and the safety of him and the Officers, Officer Siemer instructed Mr. Redon to turn around and place his hands behind his back so Officer Siemer could pat him down for weapons. Officer Siemer also advised Mr. Redon that he was not under arrest, but that he was going to place him in handcuffs for the officer's safety. As Officer Siemer grabbed Mr. Redon's hands, Mr. Redon immediately began to violently pull away from Officer Siemer's grasp. Officers Vasquez, Siemer, and I struggled with Mr. Redon for several seconds while attempting to put him in handcuffs. Mr. Redon resisted by jerking his upper body, twisting his torso, and widening his stance. Given Mr. Redon's apparent mental illness, under the influence of a controlled substance and resistance, Mr. Redon was potentially armed and dangerous. I grabbed Mr. Redon's upper body and head in a reverse headlock and placed him on the ground. Officer Siemer pulled Mr. Redon's right arm away from his front waist area. Officer Siemer placed one handcuff on Mr. Redon's right wrist. Officer Vasquez grabbed Mr. Redon's left arm that was clinched against his chest and placed it behind Mr. Redon's back. Officer Siemer placed the other cuff on it. I released the headlock and Mr. Redon began yelling uncontrollably and attempted to pull away from Officers Siemer's and Vasquez's grasps. We explained to Mr. Redon that he was being transported to the County Mental Health ("CMH") facility to be evaluated by the psychiatric staff.

Mr. Redon refused to calm down and became increasingly uncooperative. Officers Siemer and Vasquez attempted to pick Mr. Redon up and escort him outside. Mr. Redon began to violently struggle using his upper torso and legs to pull away from Officers Siemer's and Vasquez's grasps. Mr. Redon latched onto the frame of his apartment doorway with both legs in an effort to prevent these officers from removing him from the Residence or get away. Officers Siemer and Vasquez were able to drag Mr. Redon into the hallway. Officers Siemer and Vasquez directed Mr. Redon back the ground in a prone position to prevent any injuries to themselves, Mr. Redon and Officers Natal and Jordan. Officers Siemer and Vasquez requested my assistance. I picked up Mr. Redon's feet and Officers Siemer and Vasquez carried Mr. Redon by his upper body.

At approximately 6:28 p.m., Mr. Redon began to violently thrash his legs and repeatedly kick at me. I set Mr. Redon's feet down, grabbed him by his upper body, shirt and pulled him to the ground incorporating a shoulder pin. Sergeant Havin was at the scene and provided me with a cord cuff. I restrained Mr. Redon's legs with a department approved cord cuff. Sergeant Havin supervised the court cuff application and ensured the application was consistent with the SDPD's policies and procedures. Officers Siemer, Vasquez . And I picked Mr. Redon up and escorted him outside and placed him inside the rear seat of Officer Vasquez's patrol car without further incident. Officers Vasquez   and Natal transported Mr. Redon to County Mental Health.

(ECF No. 83-7 at 3-5).

Plaintiff states in his declaration,

the Officers asked to handcuff me to search me for weapons and I then asked the officers to leave my residence and without giving me any other

1   orders, the Officers grabbed me and quickly cuffed my hands behind my
2   back.  I started to yell, "Hey, what are you doing?  I've done nothing
    wrong!"  The Officers picked me up inside the kitchen and walked a few
3   feet over rotated me face down and carried me out into the hallway where
    an unknown officer to me at the time (Officer Jordan) executed a shoulder
4   pin, driving me into the ground face first on the far side of the hallway
    towards the elevator from my apartment.  I started to scream "Somebody
5   Help!  Somebody please help, I've done nothing wrong!" hoping one of
    my neighbors would come out and see what was happening.  I turned to
6   just screaming "help" as the Officers continued to crawl on top of me with
    their knees, practice pain holds and manipulate my limbs for what felt like
7   a few minutes.  No one came to my aid and I realized my screams were
    actually making the Officers try to hurt me more.  I stopped trying to get
8   help, realizing that my screams were encouraging the officers to use more
    force.  The Officers stopped hurting me and picked me up to carry me
    outside.
9   (ECF No. 102-11 at 3-4).  Plaintiff was transported by the officers to County Mental
10  Health.
11  August 19, 2011
12      On August 19, 2011, Officer Jordan was working in a parked patrol vehicle with
13  his partner Officer Ruiz.  The officers responded to a report of domestic violence at
14  Plaintiff's residence.  Plaintiff's wife, Lauren Redon had made a 911 call to the police
15  dispatcher. Officer Jordan recalled the previous contact with Plaintiff.  The officers
16  approached the door of the residence and smelled a strong odor of marijuana and heard
17  loud arguing.  Lauren Redon answered the door.  Officer Ruiz and Lauren Redon went
18  out into the hallway.  Plaintiff remained inside holding a small child.  Officer Jordan
19  began speaking to Plaintiff who recognized Officer Jordan from the May incident.
20      Based on Lauren Redon's report of domestic violence and his previous
21  experience with Plaintiff's volatile demeanor, Officer Jordan asked Plaintiff to place the
22  baby on the bed behind him.  Plaintiff refused.
23      Lauren Redon and Officer Ruiz returned and Officer Jordan told Lauren Redon
24  to take the baby.  As Plaintiff handed the baby to his wife, Officer Jordan took a hold
25  of Plaintiff's right wrist.  A struggle followed.  Officer Jordan states that Plaintiff
26  resisted and that he applied a carotid restraint, that Plaintiff continued to resist, and that
27  Officer Ruiz applied the X-26 Taser to stop the resistance.  Officer Jordan states that
28  Plaintiff went unconscious from the carotid restraint and officers applied handcuffs, and

1    that five or six seconds later Plaintiff regained consciousness and began to yell and

2    interfere with the follow-up interview with Lauren Redon.

3            Officer Ruiz states,

> Officer Jordan asked Mrs. Redon to take the child as he grasped Mr.
> Redon's right arm. Mrs. Redon grabbed the baby from Mr. Redon's left
> arm. I grabbed Mr. Redon's left arm . . . Mr. Redon ignored our
> commands, and attempted to retreat into the kitchen. I tried to put Mr.
> Redon's left arm behind his back, but he flexed his muscles and tensed his
> arms. Due to Mr. Redon's movements, I lost control of Mr. Redon's left
> arm. Mr. Redon closed his fists and began breathing heavily as if he was
> going to fight Officer Jordan and me. Mr. Redon continued his violence
> by fighting with Officer Jordan. I grabbed Mr. Redon's left arm again and
> gave him a distraction blow to his stomach with my right knee to gain Mr.
> Redon's compliance. The distraction blow did not affect Mr. Redon as he
> continued fighting with Officer Jordan and me. As Officer Jordan began
> applying a carotid restraint, I saw Mr. Redon swing his arm up appearing
> that he was trying to punch Officer Jordan in the face. Due to Mr.
> Redon's resistance, Officer Jordan could not complete a carotoid restraint
> to stop Mr. Redon's assaultive behavior. I pull my X-26 Taser and
> deployed it in dart mode on Mr. Redon's lower abdomen. The Taser
> deployment did not create any neuromuscular disruption to Mr. Redon
> because he continued to resist Officer Jordan. I conducted a drive stun
> with the Taser to Mr. Redon's right knee. After the drive stun, Officer
> Jordan was able to complete the carotid restraint. Once Mr. Redon lost
> consciousness due to Officer Jordan's completed carotid restraint, I turned
> the Taser off and told Officer Jordan that "he's out."

16   (ECF No. 83-9 at 4-5.)

17           Plaintiff states in his declaration that he was not resisting, that he was unarmed,

18   and surrendering. (ECF No. 102-11 at 9). Lauren Redon testified under oath that

19   Plaintiff handed her the baby. Lauren Redon testified,

> So I got her in my arms. Next thing I know, I see Officer Ruiz kicking
> [Plaintiff] in the stomach. No one said anything at this point. So I said,
> "What's going – what are you doing? What's going on?" And as soon as
> I said that, both officers started yelling at him "Stop resisting. Stop
> resisting." So I started yelling, "He's not resisting." I'm a physical
> therapist. I know what muscles look like when they're tense. I know what
> it looks like when someone's fighting back. His hands were relaxed. His
> head was down. You know, if someone's resisting, they'd be pulling up,
> they'd be trying to break away. I saw none of that. So I just kept saying,
> "He's not resisting. He's not resisting . . .
>
> Then Officer Jordan put him in a choke hold like up against a wall. I'm
> still yelling, "He's not resisting. What are you doing?" My husband's
> arms are by his side, open, like "What's happening?" He goes out in the
> choke hold. Officer Jordan brings him to the ground. And I see Officer
> Ruiz start to kind of bumbling with his taser. And I am looking at him,
> like, "What is going on? Are you seriously bringing out that taser?" I'm
> going, "What's happening here?" And they're totally ignoring me this

whole time.  And he takes out his taser and shoots him in the chest.  A man who's out cold.  Um, no response from my husband.  He just kind of fell over to the side . . . They finished handcuffing – his hands were already behind his back when he was tasered.  But they finished handcuffing him.

(ECF No. 102-19 at 11-12, 15-16).[3]

The officers handcuffed Plaintiff, and called paramedics.  Plaintiff was transported to the hospital and treated for puncture wounds from the taser probe and loss of consciousness.

Plaintiff was subsequently charged with resisting a peace officer (Officer Jordan) under Penal Code § 148(a)(1) and resisting a peace officer (Officer Ruiz) under Cal. Penal Code § 148(a)(1) based upon the incident.  After a jury trial, Plaintiff was convicted of resisting Officer Jordan.  (ECF No. 83-17 at 2).  The jury was deadlocked and unable to reach a verdict on the charge of resisting Officer Ruiz.  (ECF No. 83-18 at 2).

### CONTENTIONS OF THE PARTIES

Defendants contend that they are entitled to summary judgment on the claim of excessive force on the grounds that the force used in each of these incidents was reasonable.  Defendants assert that they used reasonable force on May 3, 2011 in light of Plaintiff's mental instability, the immediate threat that Plaintiff posed to the officers, and the objective reasonableness of the force used.  Defendants assert that they used reasonable force on August 19, 2011 in light of the potential dangerousness of the domestic violence call and Plaintiff's mental instability, the immediate threat that Plaintiff posed to the officers, and the objective reasonableness of the force used.

Defendants further contend that even if the force used was not reasonable, they are entitled to qualified immunity.  Defendants assert that a reasonable law enforcement officer would not believe the use of a reverse headlock and cord cuff in the May 2011 incident; or the use of a carotid restraint, a distraction blow, and a taser in the August

---

[3] Plaintiff submits the transcript from his state court prosecution for resisting a peace officer.

1   2011 incident would violate Plaintiff's constitutional rights.  Defendant Jordan further
2   contends that he is entitled to summary judgment on the claim that he used excessive
3   force on August 19, 2011 based upon the verdict of the state court jury.

4        Plaintiff contends that Officer Jordan violated his right to be free from
5   unreasonable search and seizure on May 3, 2011 by deploying a reverse headlock,
6   shoulder pin, and cord cuff in tandem with other officers.  Plaintiff asserts that the force
7   used against him on May 3, 2011 by Officer Jordan was disproportionate on the
8   grounds that he was not suspected of any crime and was not a danger to others or to
9   himself.  Plaintiff contends that Officer Jordan and Officer Ruiz violated his right to be
10  free from unreasonable search and seizure on August 19, 2011 by deploying a carotid
11  choke until Plaintiff was unconscious and deploying a taser while he was unconscious.
12  Plaintiff asserts that the Defendant officers are not entitled to qualified immunity for the
13  violations of his Fourth Amendment rights.

14  **ANALYSIS**

15  <u>Plaintiff's Motion to Withdraw Admissions (ECF No. 97)</u>

16       Plaintiff moves the Court to withdraw deemed admissions pursuant to Rule 36
17  of the Federal Rules of Civil Procedure.  Plaintiff asserts that he served late responses
18  and requests the Court allow him to withdraw the admissions.  Defendants contend that
19  they will be prejudiced by withdrawal of the admissions because fact discovery closed
20  on December 2, 2016.  Defendants assert that the request for admissions was served on
21  Plaintiff on June 15, 2015, that Plaintiff failed to file a timely response, and that
22  Defendants have relied upon the admissions.

23       Rule 36(b) provides:

24  A matter admitted under this rule is conclusively established unless the
    court, on motion, permits the admission to be withdrawn or amended.
25  Subject to Rule 16(e), the court may permit withdrawal or amendment if
    it would promote the presentation of the merits of the action and if the
26  court is not persuaded that it would prejudice the requesting party in
    maintaining or defending the action on the merits. An admission under this
27  rule is not an admission for any other purpose and cannot be used against
    the party in any other proceeding.

28

Fed. R. Civ. P. 36(b).  The Court finds that it would promote the presentation of the merits of the action to allow the withdrawal of the admissions.  However, the Court is persuaded that allowing this withdrawal would prejudice the defendants in maintaining or defending the action on the merits because fact discovery closed on December 2, 2016.

Plaintiff's motion to withdraw the requests for admissions dated June 15, 2015 is denied.  The Court further finds that these admissions do not affect the resolution of the material issues on summary judgment, that is, whether the facts, viewed in the light most favorable to the Plaintiff, show that the force used was reasonable and that a reasonable official would have understood that he was violating Plaintiff's rights.

Defendants' Motion for Summary Judgment (ECF No. 83)

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  The moving party has the initial burden of demonstrating that summary judgment is proper.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 324 (1986).

To avoid summary judgment, the nonmovant must designate which specific facts show that there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).  A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The materiality of a fact is thus determined by the substantive law governing the claim or defense.  *See Anderson*, 477 U.S. at 248, 252; *Celotex*, 477 U.S. at 322; *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In *Mattos v. Agarano*, the Court of Appeals examined "qualified immunity and

excessive force generally." 661 F.3d 433, 440 (9th Cir. 2011). The Court explained,

> In determining whether an officer is entitled to qualified immunity, we employ a two-step test: first, we decide whether the officer violated a plaintiff's constitutional right; if the answer to that inquiry is "yes," we proceed to determine whether the constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question.

*Id.* Initially, the Court must determine whether the force used by Defendants against Plaintiff was reasonable under the Fourth Amendment, and whether Defendants are entitled to judgment in their favor on Plaintiff's claim of excessive force pursuant to 42 U.S.C. § 1983.

The Court of Appeals explained,

> For the first step—whether the official violated a constitutional right—we begin by looking to the Supreme Court's guidance on the excessive use of force in *Graham v. Connor*, 490 U.S. 386 (1989). In *Graham*, the Court instructed that "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." 490 U.S. at 396 (internal quotation marks omitted). More recently, the Court has emphasized that there are no per se rules in the Fourth Amendment excessive force context; rather, courts "must still slosh [their] way through the factbound morass of 'reasonableness.' Whether or not [a defendant's] actions constituted application of 'deadly force,' all that matters is whether [the defendant's] actions were reasonable." *Scott v. Harris*, 550 U.S. 372, 383 (2007).
>
> We apply *Graham* by first considering the nature and quality of the alleged intrusion; we then consider the governmental interests at stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Deorle v. Rutherford*, 272 F.3d 1272, 1279-80 (9th Cir.2001). As we have previously explained, "[t]hese factors, however, are not exclusive. Rather, we examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (*quoting Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir.1994)).

*Id.* at 441.

May 3, 2011 – Officer Jordan

For the first step – whether Officer Jordan used constitutionally excessive force – the Court first considers the nature and quality of the alleged intrusion. In this case, Officer Jordan used a reverse headlock to place Plaintiff on the ground while Plaintiff

struggled.  The officers placed Plaintiff in handcuffs.  Officer Jordan released the headlock and Plaintiff continued to struggle with the other officers.  Officer Jordan pinned Plaintiff to the grounds and applied a cord cuff to Plaintiff's ankles in order to restrain Plaintiff from kicking his legs to safely transport him to the patrol car.

The officers were called to respond to report by a therapist that Plaintiff was a danger to himself.  Under the applicable state law, officers are authorized to bring an individual to a designated mental health facility for an evaluation if there is probable cause to believe that the person is, "as a result of mental health disorder, a danger to others, or to himself or herself, or is gravely disabled[.]"  Cal. Welf. & Inst. Code § 5150(a).

Upon arrival, the Officers were required to determine whether the Plaintiff was a danger to himself or other.  Plaintiff described his Facebook posting "No more apologies Lauren, good-bye cruel world, </poof>" to the officers. (ECF No. 102-11 at 3).  Plaintiff told the officers that he was emotionally distraught over his wife and daughter leaving.  The officers were confronted with an individual who was visibly upset and reported to be suicidal.  The undisputed facts show that Officer Siemer asked to handcuff Plaintiff to search him for weapons.  The undisputed facts show that Plaintiff resisted, that a struggle took place, and that the officers, including Officer Jordan,  took Plaintiff to the ground and handcuffed him.  Plaintiff continued to resist and Officer Jordan restrained his legs with a cord cuff.  Plaintiff states when he stopped resisting the officers, the officers stopped escalating the force used and placed him in the patrol vehicle.

Based upon the nature of the call, Plaintiff's deteriorating emotional state, and Plaintiff's active resistance, the undisputed facts support the conclusion that the Officer Jordan used no more than the amount of force necessary under the circumstances.  The danger was real and significant.  The request to handcuff Plaintiff to search him for weapons made by Officer Siemer was reasonable and necessary.  *See Estate of Tapueluelu v. City and Cty. of San Francisco*, 268 Fed. Appx. 639, 640 (9th Cir. 2008)

("Under the circumstances, it was objectively reasonable for the officers to handcuff Mr. Tapueluelu to restrain him while taking him into protective custody and awaiting an ambulance."). Plaintiff's resistance was active and significant. The officers responded to a call by a therapist reporting that Plaintiff was suicidal, and encountered an emotionally distraught individual who actively resisted the request of the officers to place him in handcuffs to search him for weapons. The Court concludes that the officers used no more force that necessary to safely transport Plaintiff to county mental health.

Viewing the facts in this case in the light most favorable to Plaintiff, the Court concludes that Officer Jordan is entitled to summary judgment on the claim of constitutionally excessive force on May 3, 2011. Even if the force used was more than necessary under the circumstances, the Court would conclude that Officer Jordan is entitled to qualified immunity for his actions on May 3, 2011. In *Mattos*, the Court of Appeals stated,

> We are careful, however, to apply the "clearly established" rule in such a way that faithfully guards "'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) (quoting *Butz v. Economou*, 438 U.S. 478, 506 (1978)). We must also allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

661 F.3d at 441. Officer Jordan is entitled to qualified immunity unless it was "'sufficiently clear' that every reasonable official would have understood that what he was doing violates [Plaintiff's] right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In this case, the nature and quality of the force used judged from the perspective of a reasonable officer on the scene – not from the perspective of the person seized or of a court reviewing the situation with 20/20 hindsight supports the finding that Officer Jordan could reasonably believe that his conduct was lawful. Based upon the nature of the call, the volatile situation presented, and the active resistence of the Plaintiff, the Court concludes that

Officer Jordan's conduct was objectively reasonable.  *See Bryan v. MacPherson*, 630 F.3d 805, 832 (9th Cir. 2010) ("If an officer's use of force was premised on a *reasonable* belief that such force was lawful, the officer will be granted immunity from suit, notwithstanding the fact excessive force was deployed." (internal quotation omitted)).

<u>August 19, 2011 – Officer Jordan</u>

Initially, the Court must determine whether the state court jury verdict finding Plaintiff guilty of resisting arrest by Officer Jordan on August 19, 2011 supports summary judgment in favor of Officer Jordan.  In *Heck v. Humphrey*, the United States Supreme Court explained,

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.  Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed in the absence of some other bar to the suit.

512 U.S. 477, 486-87 (1994).

In *Hooper v. Cty. of San Diego*, the Court of Appeals for the Ninth Circuit held that "a conviction under California Penal Code § 148(a)(1) does not bar a § 1983 claim for excessive force under *Heck* when the conviction and the § 1983 claim are based on different actions during 'one continuous transaction.'"  629 F.3d 1127, 1134 (9th Cir. 2011).  In *Hooper*, a deputy grabbed the plaintiff's wrist and told her she was under

arrest for possession of a controlled substance. *Id.* at 1129. The plaintiff then jerked her hand away. *Id.* During the ensuing struggle, the plaintiff ended up face down on the ground with the officer sitting on her back. *Id.* The plaintiff continued to struggle for a brief time and stopped when the deputy was able to hold the plaintiff's hands behind the plaintiff's back. *Id.* While the deputy was waiting for backup to arrive, he called for his canine to come over, and the canine bit the plaintiff's head causing significant injuries. *Id.* The plaintiff pled guilty to resisting a peace officer under Cal. Penal Code § 148(a)(1), and brought suit under § 1983 for excessive force. *Id.* In that suit, the plaintiff did not dispute the lawfulness of her arrest, or that she resisted arrest. *Id.* Rather, the plaintiff claimed the deputy used excessive force when he called upon his dog. The Court of Appeals held that the plaintiff's excessive force claim was not barred under *Heck.* The Court of Appeals concluded that "[a] holding in [the plaintiff's] § 1983 case that the use of the dog was excessive force would not negate the lawfulness of the initial arrest attempt, or negate the unlawfulness of [the plaintiff's] attempt to resist it" by jerking her hand away from the deputy. *Id.* at 1133 (internal quotation marks omitted). *See also Yount v. City of Sacramento*, 183 P.3d 471, 482 (Cal. 2008) ("[A] defendant might resist a lawful arrest, to which the arresting officers might respond with excessive force to subdue him. The subsequent use of excessive force would not negate the lawfulness of the initial arrest attempt, or negate the unlawfulness of the criminal defendant's attempt to resist it. Though occurring in one continuous chain of events, two isolated factual contexts would exist, the first giving rise to criminal liability on the part of the criminal defendant, and the second giving rise to civil liability on the part of the arresting officer.") (internal quotation marks omitted).

In this case, the record conclusively shows that Plaintiff's conviction under Cal. Penal Code § 148(a)(1) bars the § 1983 claim for excessive force against Officer Jordan. In order to find Plaintiff guilty of resisting a peace officer, the state jury was required to find that Officer Jordan was lawfully performing his duties and did not use

unreasonable or excessive force when he encountered Plaintiff on August 19, 2011. The jury was instructed that in order to prove that Plaintiff was guilty of resisting a peace officer in the performance of their duties, the People must prove that Brandon Jordan was a peace officer "lawfully performing or attempting to perform [his] duties as a peace officer."  (ECF No. 83-15 at 3); *see Susag v. City of Lake Forest*, 94 Cal. App.4th 1401, 1409 (Cal. Ct. App. 2002) ("In California, the lawfulness of an arrest is an essential element of the offense of resisting or obstructing a peace officer.").  The jury was further instructed that "[a] peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using  unreasonable or excessive force in his duties."  (ECF No. 83-15 at 3),  *See People v. Olguin*, 119 Cal. App.3d 39, 44 (Cal. Ct. App. 1981) ("excessive force by a police officer . . . is not within the performance of the officer's duty.").

The Court concludes that any recovery of damages for unconstitutional excessive force by Officer Jordan on August 19, 2011 in this case would necessarily imply the invalidity of Plaintiff's conviction for resisting Officer Jordan.  The record demonstrates that the state court jury was presented with the identical facts alleging excessive force against Officer Jordan, and that the force used by Officer Jordan occurred in a continuous chain of discrete acts prior the Plaintiff's arrest for resisting a peace officer. The jury returned a verdict finding Plaintiff guilty of resisting Officer Jordan.[4]  Plaintiff appealed and the state court upheld the jury verdict.   Plaintiff is estopped by the state court verdict from relitigating whether Officer Jordan used excessive force on August 19, 2011.  *Susag*, 94 Cal. App.4th at 1410 ("[A]ny claim of excessive force based on discrete acts that occurred immediately preceding [the plaintiff's] arrest is barred by the Supreme Court's holding in *Heck v. Humphrey*, . . . since a finding in his favor would necessarily imply the invalidity of his conviction under Penal Code section 148,

---

[4] The jury was unable to reach a verdict on the charge against Plaintiff of resisting Officer Ruiz.

1   subdivision (a).").

2       Defendant Jordan's motion for summary judgment on claims that he used

3   excessive force on August 19, 2011 is granted.

4   <u>August 19, 2011 – Officer Ruiz</u>

5       Officer Ruiz used a distraction blow and a taser against Plaintiff on the August

6   19, 2011.  The officers were confronted with the potential dangerousness of a domestic

7   violence call and the reasonableness of the force used is directly related to the

8   immediate threat to the safety or the officers, and active resistance of the Plaintiff.  "The

9   [] factor – whether the suspect posed an immediate threat – is the most important."

10   *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016).

11       In this case, the facts relevant to this factor are in genuine dispute.  Officer Ruiz

12   states in his declaration that he deployed his taser to stop Plaintiff's assaultive behavior

13   against Officer Jordan and himself.  Plaintiff's wife testified at the state court trial that

14   Officer Ruiz used the taser on Plaintiff while he was unconscious.  "In considering a

15   motion for summary judgment, the court may not weigh the evidence or make

16   credibility determinations, and is required to draw all inferences in a light most

17   favorable to the non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.

18   1997); *see also Anderson*, 477 U.S. at 255.  Viewing the facts in the light most

19   favorable to Plaintiff, the Court concludes that deploying a taser on an unconscious

20   individual is excessive and not reasonable.

21       The Court must next decide whether Defendants are entitled to qualified

22   immunity even if the *Graham* factors are not met and the force used was not reasonable

23   as a matter of law.  In *Mattos*, the Court of Appeals explained,

24       The Supreme Court has made "clear that officials can still be on notice that
their conduct violates established law even in novel factual

25   circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  We are
particularly mindful of this principle in the context of Fourth Amendment

26   cases, where the constitutional standard—reasonableness—is always a
very fact-specific inquiry.  If qualified immunity provided a shield in all

27   novel factual circumstances, officials would rarely, if ever, be held
accountable for their unreasonable violations of the Fourth Amendment.

28

*See Deorle*, 272 F.3d at 1286 ("Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct."). That result would not properly balance the competing goals to "hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). . .

Finally, *Graham*'s general excessive force standard cannot always, alone, provide fair notice to every reasonable law enforcement officer that his or her conduct is unconstitutional. *See Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (per curiam) (explaining that *Graham* and *Tennessee v. Garner*, 471 U.S. 1 (1985), "are cast at a high level of generality" and cannot, in every case, "offer a basis for decision"). The Supreme Court has stated, however, that "in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." *Id.* at 199 (*citing Hope*, 536 U.S. at 738). Although this "obvious case" exception remains good law, the Supreme Court recently clarified that the bar for finding such obviousness is quite high. In *al-Kidd*, the Court emphasized that it has "repeatedly told courts not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." 563 U.S. at 742 (citations omitted). With these principles in mind, we turn to the cases before us.

661 F.3d at 442-43. Viewing the facts in the light most favorable to Plaintiff, this Court concludes that a reasonable officer could not reasonably believe that deploying a taser on an unconscious individual was lawful. *See also Newmaker*, 842 F.3d at 1116 ("Summary judgment [granting qualified immunity] is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt."); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) ("[I]t was 'beyond debate' that using non-trivial force in response to such passive bystander behavior would be constitutionally excessive.") (*quoting al-Kidd*, 563 U.S. at 741).

Defendant Jordan's Motion for Summary Judgment on claims that he used excessive force on August 19, 2011 is denied.

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (ECF No. 83) is granted as to Defendant Jordan and denied as to Defendant Ruiz; and Plaintiff's Motion to Withdraw Admissions (ECF No. 97) is denied.

DATED:  March 28, 2017

**WILLIAM Q. HAYES**
United States District Judge